STATE OF NORTH CAROLINA v. CLIFFORD RAY PUTMAN

No. 7521SC657

(Filed 17 December 1975)

1. **Searches and Seizures § 1— warrantless search of apartment basement — admissibility of evidence obtained thereby**

   The trial court did not err in admitting evidence obtained pursuant to a warrantless search of an apartment basement notwithstanding the fact that access to the basement could be had only through the apartment, since the basement was not included in the lease of the apartment to defendant, control of the basement was vested in the landlord who not only consented to but participated in its search, the lease expressly gave the landlord the right to enter the apartment and his lawful entry gave him the right to permit the police to pass through the front door and hallway of the apartment in order to reach the basement.

2. **Burglary and Unlawful Breakings § 5; Larceny § 7— breaking and entering house — sufficiency of evidence**

   Evidence was sufficient to be submitted to the jury in a prosecution for breaking or entering and larceny where it tended to show that a house was broken into, items valued in excess of $6000 were taken, defendant was observed near the time of the larceny carrying a white sack and crossing fences in the neighborhood of the house broken into, and items taken from the house were found in the basement of defendant's apartment.

APPEAL by defendant from *Walker (Hal H.), Judge.* Judgment entered 10 April 1975 in Superior Court, FORSYTH County. Heard in the Court of Appeals 17 November 1975.

 By indictment proper in form defendant was charged with (1) breaking and entering a building occupied by Beulah Cox Dizor as a dwelling house, (2) larceny of personal property

State v. Putman

having a value of $6,923.15, and (3) receiving stolen property. He pleaded not guilty.

Evidence presented by the State is summarized in pertinent part as follows:

On Sunday, 16 February 1975, Mrs. Dizor, a widow, and her mentally retarded sister resided in a house at 312 Cascade Avenue in Winston-Salem, N. C. On that date, they left the house at around 9:30 a.m. to attend Sunday School and church. Before leaving they secured all doors leading from the outside into the house. When they returned home around 12:30 p.m., they found the house had been ransacked, and personal property consisting of silverware, jewelry, bed linens, food and other items, valued in excess of $6,000, was missing. The back door to the home was standing ajar, the lock was loose, and there was a cut out place in the wood where the door had been pried open.

On the day in question, George Killian resided at 228 Cascade Avenue. His house was situated on the corner of the next block east of the Dizor residence on the same side of the street. Hollyrood Street ran immediately west of the Killian residence and there was one residence between that street and the Dizor residence. Between 10:30 and 11:00 a.m., while Mr. Killian was standing in the back of his house looking out toward Hollyrood Street and the rear of his lot, he saw two white males enter the southwest corner of his lot from Hollyrood Street. When he first saw the men they were near the middle of Hollyrood Street at a point approximately 300 feet from the Dizor residence. Both of the men had long hair, appeared to be in their late teens or early twenties, and were dressed in blue denim or similar material. Each was carrying a large white bag over his shoulder, leaning forward so as to indicate that the contents of the bags were quite heavy. Mr. Killian observed the men as they carried the bags across the back of his lot, over a fence onto the Dreyer lot which is located immediately to the rear of the Killian lot facing Banner Avenue; he then saw them cross two other fences onto property located at 213 Banner Avenue which is east of the Dreyer lot. There the men entered an outbuilding near the rear northwest corner. Shortly thereafter, one of the men emerged from the outbuilding and entered the main building at 213 Banner Avenue. Not long after the men crossed over the fences, Mr. Killian saw Mr. Sotomayor and Miss Dreyer near the back of the Dreyer lot. He observed

them pick up some items near the point where the men crossed the first or second fence.

Mr. Sotomayor, a student, was living in the Dreyer residence located immediately back of the Killian residence. Around 10:35 on the morning in question, while looking out of his back window, Sotomayor saw a person, whom he identified in court as defendant, climb the fence between the Killian and Dreyer lots as well as the fences east of the Dreyer property. Defendant would get the bag over the fences first and would then cross himself. As defendant was crossing the fence east of the Dreyer lot, he dropped and then picked up two or three silver looking dishes. Defendant was within seven or eight yards of Mr. Sotomayor who could hear the contents of the bag rattling "like metal things." Mr. Sotomayor and Miss Dreyer went to the spot in their yard where he had seen defendant and, at that point, they picked up a glove and two boxes containing a white necklace, a gold bracelet, and some green items. Miss Dreyer had occasion to be in her backyard the preceding afternoon and the glove and boxes were not there at that time. It had rained most of Saturday night and, while the ground where the boxes and glove were found was very wet, they were dry. Soon thereafter, Mr. Sotomayor and Miss Dreyer walked by the residence at 213 Banner Avenue and, as they were passing the residence, he heard clinking sounds "like metal things." The two of them walked on around the block to Mr. Killian's residence and had a conversation with him regarding what they had seen. Before they passed 213 Banner the first time, they saw a cream colored car with Oklahoma license plates drive up to, and stop at, 213 Banner; when they came back a few minutes later, the car was gone. Immediately after returning to her home, Miss Dreyer called the police who went to her home immediately and were informed of what Miss Dreyer and Mr. Sotomayor had seen, heard, and found. A few minutes later Mr. Sotomayor saw defendant in the backseat of a police car.

Police responded to the call from the Dreyer residence at about 11:40 a.m. After receiving a description of the man Mr. Sotomayor had seen in the Dreyer backyard, Officer J. E. Snyder began driving around the area. After stopping his patrol car on Hollyrood Street, between Banner and Cascade Avenues, he saw a white male running north between some houses in the same block on which the Killian, Dreyer, and 213 Banner Avenue residences were located. Snyder immediately drove to

Cascade Avenue where he saw the same male cross Cascade running north. Snyder proceeded north to Gloria Avenue, which runs parallel to Cascade, and there saw the same man start walking west on Gloria Avenue. Snyder stopped the man, later identified as defendant, and took him in his patrol car to the Dreyer residence. Snyder had seen defendant some five days earlier while working a license checkpoint; on that occasion defendant was driving a 1964 Ford with Oklahoma license plates and stated that he was living at 213 Banner Avenue. After detaining defendant for 30 or 40 minutes, Snyder released him. At this time Mrs. Dizor had not reported the burglary.

The main building at 213 Banner Avenue was an apartment house belonging to James L. Sweet. There was one apartment on the street floor and two apartments on the second floor, these latter apartments having outside entrances. The street floor apartment had a front and a rear entrance. Less than a month prior to 16 February 1975, Mr. Sweet rented the street floor apartment to one Paschal who paid a month's rent. Defendant was with Paschal at the time. The building had an unfinished basement, accessible only by a stairway leading from an unlocked door in the hall of the street floor apartment. The lease to Paschal did not include any part of the basement and gave Sweet permission to go in the apartment for purpose of inspecting the premises.

On the afternoon of 21 February 1975, at the request of police, Mr. Sweet met Detective Beane at 213 Banner Avenue. Defendant was in jail at the time. Police had determined previously that the outbuilding on the premises had not been rented and Det. Beane went there for the purpose of searching the outbuilding. When Det. Beane arrived, Mr. Sweet was already there; the front door of the street floor apartment was unlocked, Mr. Sweet was inside and, with his consent, Det. Beane entered the apartment. The apartment had been vacated and contained no property belonging to defendant or Paschal. Mr. Sweet and Det. Beane went to the basement to "look around." Observing something unusual, Mr. Sweet crawled through a small opening between the ground and the floor timbers and found a pillowcase containing numerous articles.

Mrs. Dizor identified the glove, boxes and contents found in the Dreyer yard, and the pillowcase and contents found in or near the basement at 213 Banner Avenue, as being her or

her sister's property and among those items taken from their home.

Defendant offered no evidence.

A jury found defendant guilty of counts (1) and (2), breaking and entering and larceny. From judgment imposing prison sentences as a "committed youthful offender," defendant appealed.

*Attorney General Edmisten, by Associate Attorney David S. Crump, for the State.*

*Wilson and Morrow, by Alvin A. Thomas, for defendant appellant.*

BRITT, Judge.

[1]    First, defendant contends the search of the apartment and basement without a search warrant was illegal and that the court erred in admitting the evidence obtained pursuant to the search. We find no merit in this contention.

It is settled that the Fourth Amendment to the Federal Constitution and Art. 1, Sec. 19, of our State Constitution guarantee that, in ordinary circumstances, even the strong arm of the law cannot invade a home except under authority of a search warrant issued in accordance with statutory provisions, and evidence obtained by an illegal search without a search warrant is inadmissible. *State v. Robbins*, 275 N.C. 537, 169 S.E. 2d 858 (1969), and authorities therein cited. The case at bar, however, does not come within the ambit of the stated rules and we will not attempt to set forth all of the reasons why this is true.

Defendant's challenge applies primarily to the search of the basement and not of the apartment. The evidence showed without question that any lease which Paschal and defendant had did not cover the basement. At most, they had permission, along with lessees of the other apartments, to store boxes in the basement, but control of the basement was vested in the landlord who not only consented to, but participated in, its search. The question then narrows to whether Mr. Sweet had authority to provide police entrance to the basement via the hallway of the apartment. We hold that he did. In addition to the fact that the apartment had been vacated, the lease expressly gave Mr. Sweet the right to enter the apartment and

Harden v. Bank

his lawful entry gave him the right to permit the police to pass through the front door and hallway of the apartment in order to reach the basement. *United States v. Matlock*, 415 U.S. 164, 39 L.Ed. 2d 242, 94 S.Ct. 988 (1974). *See, e.g., United States v. Mojica*, 442 F. 2d 920 (2d Cir. 1971).

[2]   Next, defendant contends the court erred in denying his motion for nonsuit. This contention has no merit. When the evidence is considered in the light most favorable to the State, and the State is given the benefit of reasonable inferences therefrom, as we are required to do, we think it is sufficient to survive the motion for nonsuit. *See* 2 Strong, N. C. Index 2d, Criminal Law, § 104. While there were discrepancies in the evidence, i.e., the testimony of Mr. Killian that he saw two men and the testimony of Mr. Sotomayor that he saw only one, this presented a question of fact for the jury to resolve; it did not warrant nonsuit. *State v. Mabry*, 269 N.C. 293, 152 S.E. 2d 112 (1967).

We hold that defendant received a fair trial, free from prejudicial error.

No error.

Chief Judge BROCK and Judge MORRIS concur.